# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**FILED**

March 16, 2015

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**Gerald S.,**
**Petitioner Below, Petitioner**

**vs)  No. 14-0156** (Mercer County 12-C-655)

**David Ballard, Warden,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Gerald S., by counsel Paul R. Cassell, appeals the Circuit Court of Mercer County's January 24, 2014, order denying his petition for writ of habeas corpus.[1] Respondent David Ballard, Warden, by counsel Janet Williamson, filed a response. On appeal, petitioner argues that the circuit court erred in denying habeas relief on the ground of ineffective assistance of counsel due to counsel's alleged failure to investigate the availability of witnesses, whether the guilty plea was knowingly, intelligently, and voluntarily made, and whether the indictment was sufficient.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In February 2008, a Mercer County Grand Jury indicted petitioner on one count of first-degree sexual abuse pursuant to West Virginia Code § 61-8B-7, ten counts of first-degree sexual assault pursuant to West Virginia Code § 61-8B-3, two counts of sexual abuse by a parent, guardian, custodian, or person in position of trust pursuant to West Virginia Code § 61-8D-5, and two counts of incest pursuant to West Virginia Code § 61-8-12. In April of 2009, a plea hearing was held and petitioner pled guilty to one count of first-degree sexual abuse, one count of first-degree sexual assault, and one count of sexual abuse by a parent, guardian, custodian, or person in position of trust. The court took the plea under advisement until it received a pre-sentence investigation report and a sex offender evaluation. After receiving the reports in July 2009, the circuit court accepted the plea agreement and sentenced petitioner to incarceration in the penitentiary for indeterminate terms of not less than one nor more than five years for first-degree

---

[1]In keeping with the Court's policy of protecting the identities of minors, the Court will refer to petitioner by his last initial throughout the memorandum decision. See W.Va. App. P. 40(e)(1).

1

sexual assault, not less than fifteen nor more than thirty-five years for first-degree sexual assault, and not less than ten nor more than twenty years for sexual abuse by a parent. The circuit court ordered that these sentences run consecutively, and that petitioner be given 197 days credit on his sentence for the time served in jail, and that petitioner pay court costs and restitution. In October of 2009, petitioner's counsel made a motion for a reduction of sentence. The circuit court denied the motion for sentence reduction by order on December 09, 2009.

In November of 2012, petitioner filed a petition for habeas relief asserting the following grounds: (1) ineffective assistance of counsel; (2) that the guilty plea was not knowingly, intelligently, and voluntarily made; (3) trial counsel was ineffective with regard to petitioner's mental state; (4) petitioner's state and federal constitutional rights were violated by his disproportionate sentence. Petitioner further filed the *Losh* checklist, waiving several of the grounds claimed in his *Losh* checklist. In February of 2013, petitioner filed a supplemental petition for habeas relief, asserting as an additional ground that the indictment violated his federal and state constitutional rights.

In May of 2013, the circuit court held an omnibus evidentiary hearing. Following the hearing, the circuit court entered an order denying the petition for writ of habeas corpus. This appeal followed.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

On appeal, petitioner re-asserts the same claims that were rejected by the circuit court. Petitioner re-asserts (1) ineffective assistance of counsel; (2) that the guilty plea was not knowingly, intelligently, and voluntarily made; (3) trial counsel was ineffective with regard to petitioner's mental state; (4) petitioner's state and federal constitutional rights were violated by his disproportionate sentence. Petitioner did not re-assert any of the grounds or present any evidence on the grounds claimed in the *Losh* checklist.

Upon our review and consideration of the circuit court's order, the parties' arguments, and record submitted on appeal, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on the errors he assigns on appeal, which were also argued below. Indeed, the circuit court's order includes well-reasoned findings and conclusions as to all of the assignments of error raised herein. Given our conclusion that the circuit court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and incorporate the circuit court's findings and conclusions and direct the Clerk to attach a copy of the circuit court's January 24, 2014, "Order Denying the Petitioner's Petition for Writ of Habeas Corpus Ad

Subjiciendum And Removing It From The Court's Active Docket" to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** March 16, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum
Justice Allen H. Loughry II

IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA.

NOTED CIVIL DOCKET
JAN 2 4 2014
JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

STATE OF WEST VIRGINIA, *ex rel,*
GERALD█████,

                                                PETITIONER,

v.                Civil Action No. 12-C-655-DS

DAVID BALLARD, Warden
MT. OLIVE CORRECTIONAL COMPLEX,        RESPONDENT.

RECEIVED
JAN 2 9 2014
CASSELL & CREWE PC

## ORDER DENYING THE PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM AND REMOVING IT FROM THE COURT'S ACTIVE DOCKET

On May 6, 2013, this matter came before the Court, the Honorable Derek C. Swope presiding, for a hearing on the Petitioner's Petition for Writ of Habeas Corpus Relief, brought pursuant to the provisions of Chapter 53, Article 4A of the West Virginia Code, as amended, which was filed by the Petitioner's court-appointed counsel, Paul R. Cassell, Esq. The Petition for Writ of Habeas Corpus was filed on November 30, 2012. The Petitioner and his counsel appeared at the omnibus hearing. Janet Williamson, Esq., Assistant Prosecuting Attorney, appeared on behalf of the State of West Virginia.

The Petitioner is seeking post-conviction habeas corpus relief from his sentence of not less than one (1) nor more than five (5) years for the offense of "Sexual Abuse – First Degree"; not less than fifteen (15) nor more than thirty-five (35) years for the offense of "Sexual Assault – First Degree"; and not less than ten (10) nor more than twenty (20) years for the offense of "Sexual Abuse by a Parent", such sentences to run consecutively for a combined sentence of twenty-six (26) to sixty (60) years. The Defendant must serve a minimum of twenty-six (26)

1

R 101

years before he is eligible for parole, absent a showing that he is being unlawfully detained due to prejudicial constitutional errors in the underlying criminal proceeding.

Whereupon, the Court, having reviewed and considered the Petition, the court files, the transcripts, the arguments of counsel and the pertinent legal authority, does hereby **DENY** the Petitioner's Petition for Writ of Habeas Corpus Relief.

In support of the aforementioned ruling, the Court makes the following General Findings of Fact and Conclusions of Law:

## I.    FACTUAL/PROCEDURAL HISTORY

### Case No. 08-F-120

#### A.  The Indictment

By a True Bill returned on February 13, 2008 by the Mercer County Grand Jury, the Petitioner, Gerald ███████, was indicted for the offenses of Sexual Abuse – First Degree; Sexual Assault – First Degree; Sexual Abuse By A Parent; and Incest .

#### B.  Specific Counts of the Indictment

The sixteen (16) count indictment contained Counts 1 and 2 charging Sexual Abuse – First Degree; Counts 3, 4, 5, 6, 7, 8, 9, 10, 11 and 12 charging Sexual Assault – First Degree; Counts 13 and 14 charging Sexual Abuse by a Parent; and Counts 15 and 16 charging Incest.

#### C.  Pre-Trial Proceedings

On February 13, 2008, the Petitioner was indicted as aforesaid by the Grand Jury for the Circuit Court of Mercer County, West Virginia. At the time of his indictment, the Petitioner was incarcerated in the Commonwealth of Virginia at the Dilwyn Correctional

2

B102

Center in Dilwyn, Virginia. The Mercer County Public Defender's Office was appointed to represent him.

The Petitioner and Kris Kostenko, Esq.,of the Mercer County Public Defender's Office, appeared on December 22, 2008, for initial arraignment. The Petitioner's trial was scheduled for February 4, 2009, at 9:30 a.m. On December 23, 2008, the Public Defender's Office advised that it had a conflict and was relieved from representing the Petitioner. Jerome J. McFadden, Esq., was appointed as his counsel.

On January 8, 2009, Mr. McFadden filed an omnibus motion for discovery on behalf of the Petitioner. On January 9, 2009, the State filed its request pursuant to Rule 16 and 12.1 of the West Virginia Rules of Criminal Procedure. On January 12, 2009, the Petitioner filed a *pro se* motion for bond reduction.

On January 26, 2009, Mr. McFadden advised that he had a conflict and asked to be relieved as counsel. The Court appointed William O. Huffman, Esq., and Derrick W. Lefler, Esq. as co-counsel for the Petitioner. Upon their appointment and the Petitioner's waiver of his right to a speedy trial, the trial date of February 4, 2009, was converted into a status hearing. Thereafter, Petitioner's newly appointed trial counsel filed a Motion For Discovery And Inspection, which triggered reciprocal discovery by the State. On February 4, 2009, the Petitioner's trial was rescheduled for April 21, 2009. A scheduling order was entered providing various deadlines for filing motions, etc.

On March 27, 2009, the State filed its "Notice Of Intent To Move The Court For The Admission of 404(b) Evidence." The State indicated that it would call four (4) family members who alleged that they were the victims of violent sexual contact by the Petitioner. The State also asked the Court to allow reference to the Petitioner's last

3

incarceration in Virginia for the violent sexual assault of his sister. On the same date, Petitioner's trial counsel filed their "Objection And Motion To Exclude 404(b) Evidence", in part asking that the State be denied the opportunity to use 404(b) evidence as the proffer was untimely submitted. The Court conducted a hearing on March 27, 2009, concerning whether the State's motion to use 404(b) evidence would be considered. The Court set a 404(b) hearing for April 21, 2009, at 9:30 a.m. and delayed the start of the trial until 1:00 p.m. that day. Because of the late disclosure, the Court also informed the Petitioner's trial counsel that it would consider a motion to allow them to depose the late-disclosed 404(b) witnesses to prepare for trial.

The Petitioner made certain allegations that he was suffering from severe medical issues and was not being properly treated in the Southern Regional Jail. The Court and counsel made efforts to determine if this was correct.

On April 13, 2009, the Court conducted a pre-trial hearing in this matter. At this hearing, the Court reminded the parties that it would conduct an evidentiary hearing on the admissibility of 404(b) evidence prior to trial. The Petitioner's trial defense informed the Court that it would move to exclude the testimony of Phyllis Hasty, Play Therapist, due to the lack of a treatment basis for her testimony.

## D. Plea Agreement

A plea hearing was held on April 21, 2009, wherein the Petitioner pled guilty to one (1) count of Sexual Abuse – First Degree; one (1) count of Sexual Assault – First Degree; and one (1) count of Sexual Abuse by a Parent. The State agreed to take no position on sentencing. The agreement also confirmed that the plea would resolve any and all matters involving criminal charges and potential criminal charges which could be filed by

4

the State of West Virginia, including any uncharged conduct which the State was aware of or which was under investigation. The Court took the plea under advisement until it received the pre-sentence investigation, and scheduled the matter for a sentencing hearing on June 18, 2009. Subsequently, the Court ordered that a sexual offender evaluation be conducted by Clayman & Associates.

## E. Sentencing

On July 6, 2009, the Court received the pre-sentence investigation, including Dr. Clayman's fourteen (14) page report. Dr. Clayman's conclusions were:

> Although it is not possible to predict any specific future act of violence or sexual impropriety, Mr. ⬛⬛⬛ history is marked by several static factors (unchangeable historical characteristics) that contribute to a substantial (moderate to high) risk for reoffending. Specifically, background characteristics associated with increased risk for recidivism include prior conviction for non-sexual violence, several prior sexual charges with one previous conviction, and multiple prior sentencing dates. Factors that prevent his estimated risk from being higher include his age, choice of female relative victims, no history of non-contact sexual offenses, and prior involvement in a long-term adult intimate relationship. Dynamic factors (those that may change over time) that further augment his recidivism risk include his history of substance abuse and lack of a clear plan for abstaining when not incarcerated, poor judgment, antisocial attitudes, and failure to accept responsibility for his own behavior.
>
> Mr. ⬛⬛⬛ would be characterized as an opportunistic offender. His victims have included both adult females and a female child, suggesting no preference for particular age groups. There are no indications that he has offended outside of his family or otherwise engaged in predatory behavior.
>
> Mr. ⬛⬛⬛ prognosis for sexual offender treatment is poor, given his lack of insight and awareness, failure to acknowledge his offender status, and prior history of failure to benefit from treatment. Should treatment be ordered, the initial stages should focus on techniques to enhance Mr. ⬛⬛⬛ motivation for change, as well as education focused on helping Mr. ⬛⬛⬛ accept responsibility for his actions. Should such techniques prove effective, intervention directed at his interpersonal deficits, attitudes about offending, victim empathy, and the relationship, if any, between his own alleged victimization history and his offenses. Because his antisocial beliefs are longstanding, extended supervision by the Court may be a further deterrent to future illegal acts.

5

(Forensic Psychological Evaluation – Clayman & Associates: Report dated June 15, 2009).

The Court accepted the plea agreement. The Petitioner was sentenced "to the penitentiary of this State and therein confined for the indeterminate terms of not less than one (1) nor more than five (5) years as provided by law for the offense of "Sexual Abuse – First Degree as the State in Count 1 of its Indictment herein hath alleged; not less than fifteen (15 nor more than thirty (35) years as provided by law for the offense of "Sexual Assault – First Degree" as the State in Count 3 of its Indictment herein hath alleged and by his plea he hath admitted; not less than ten (10) nor more than twenty (20) years as provided by law for the offense of "Sexual Abuse by a Parent" as the State in Count 13 of its Indictment herein hath alleged and by his plea he hath admitted; that these sentences run consecutively with one another; that the defendant be given credit for 197 days on his sentence for which he has served in jail; that he be dealt with in accordance with the rules and regulations of that institution and the laws of the State of West Virginia; and that he pay all court costs and restitution within one (1) year following his release from incarceration."

## F. Post Plea Matters

After the Petitioner was sentenced on October 30, 2009, Petitioner's counsel made a "Motion For Reduction Of Sentence", which was supplemented on December 1, 2009. The Court denied the sentence reconsideration motion on December 9, 2009. The Court also received numerous subsequent letters requesting reconsideration. The Court received numerous letters requesting other action, all which were lodged in the Court file and provided to counsel. As a result of one of these letters, the Court appointed Paul R.

6

B106

Cassell, Esq., to represent the Petitioner to file any pleading he deemed appropriate, including a Petition for Writ of Habeas Corpus.

On November 19, 2009, Derrick W. Lefler, Esq. filed his fee petition requesting the payment of attorney's fees and costs for his representation of the Petitioner. This document indicated that Mr. Lefler spent 3.9 hours in court and 21.72 hours out of court, for a total of 25.2 hours spent in representing the Petitioner. He also had approximately eleven (11) phone conference or face-to-face meetings with the Petitioner..

William O. Huffman, Esq. filed his fee petition requesting the payment of attorney's fees and costs for his representation of the Petitioner. This document indicated that Mr. Huffman spent 5.4 hours in court and 43.8 hours out of court, for a total of 49.2 hours spent in representing the Petitioner. He also had approximately eighteen (18) phone conferences or face-to-face meetings with the Petitioner.

Mr. Huffman's fee petition also indicated that he retained Jones Investigation to investigate the Petitioner's case and William Lunsford, Polygraph Operator. Mr. Jones' invoices indicate that he conducted several interviews of witnesses in this action.

## II. THE PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS; THE PETITIONER'S SUPPLEMENTAL MEMORANDUM; THE *LOSH* CHECKLIST; THE STATE'S ANSWER TO THE PETITION AND SUPPLEMENTAL MEMORANDUM; THE PETITIONER'S MEMORANDUM AND RESPONSE TO STATE'S ANSWER TO THE PETITIONS; THE OMNIBUS HEARING

### A. The Petitioner's Petition for Writ of Habeas Corpus and Memorandum in Support Thereof.

On November 30, 2012, the Petitioner filed his Petition for Writ of Habeas Corpus and Memorandum In Support of Petition for Writ of Habeas Corpus by his counsel, Mr. Cassell. It raised the following grounds:

1. Petitioner's Federal and State Constitutional Rights were violated by Trial Counsel's Ineffective Assistance:

    a. Trial counsel was ineffective with regard to the Petitioner's defense to the charges.

    b. Trial counsel was ineffective with regard to plea negotiations.

2. The guilty plea was not knowingly, intelligently and voluntarily made.

3. Trial counsel was ineffective with regard to Mr. ▮▮▮▮ mental state.

4. Petitioner' State and Federal Constitutional rights were violated by his disproportionate sentence.

5. Petitioner also asserts all additional grounds raised in his *Losh* checklist.

### B. Supplemental Petition for Writ of Habeas Corpus and Supplemental Memorandum in Support of Petition for Writ of Habeas Corpus

On February 21, 2013, the Petitioner, by counsel, filed a Supplemental Petition for Writ of Habeas Corpus. It raised the following additional ground:

8

B108

1. Petitioner's Federal and State Constitutional Rights were violated by the Indictment.

## C. THE *LOSH* CHECKLIST

Counsel also filed the *Losh* checklist on November 30, 2012, with grounds as follows:

### Waived Grounds:

In his *Losh* checklist the Petitioner waived the following grounds for relief:

- Trial court lacked jurisdiction
- Statute under which conviction was obtained was unconstitutional
- Indictment shows on face no offense was committed
- Denial of right to speedy trial
- Incapacity to stand trial due to drug use
- Language barrier to understanding the proceeding
- Denial of counsel
- Failure of counsel to take an appeal
- Coerced confessions
- Suppression of helpful evidence by prosecutor
- State's knowing use of perjured testimony
- Falsification of a transcript by prosecutor
- Unfulfilled plea bargains
- Double jeopardy
- Irregularities in arrest
- Excessiveness or denial of bail
- No preliminary hearing

B 104

- Illegal detention prior to arraignment

- Irregularities or errors in arraignment

- Challenges to the composition of grand jury or its procedures

- Failure to provide copy of indictment to defendant

- Defects in indictment

- Improper venue

- Pre-indictment delay

- Refusal of continuance

- Prejudicial joinder of defendants

- Lack of full public hearing

- Nondisclosure of Grand Jury minutes

- Refusal to turn over witness notes after witness has testified

- Claims concerning use of informers to convict

- Instructions to the jury

- Claims of prejudicial statement by trial judges

- Claims of prejudicial statements by prosecutor

- Acquittal of co-defendant on same charge

- Defendant's absence from part of the proceedings

- Improper communications between prosecutor or witnesses and jury

- Mistaken advice of counsel as to parole or probation eligibility

- Amount of time served on sentence, credit for time served

B110

## Asserted Grounds:

The Petitioner asserted the following *Losh* grounds:

- Prejudicial pretrial publicity

- Involuntary guilty plea

- Mental competency at time of crime

- Mental competency at time of trial

- Consecutive sentences for same transaction

- Information in pre-sentence report erroneous

- Ineffective assistance of counsel

- Refusal to subpoena witnesses

- Failure of counsel to take an appeal

- Claim of incompetence at time of offense, as opposed to time of trial

- Constitutional errors in evidentiary rulings

- Sufficiency of evidence

- Question of actual guilt upon an acceptable guilty plea

- Severer sentence than expected

- Excessive sentence

## D. THE STATE'S ANSWER AND MEMORANDUM IN RESPONSE TO THE SUPPLEMENTAL PETITION FOR WRIT OF HABEAS CORPUS

On April 4, 2013, the Respondent, by and through Assistant Prosecutor Williamson, filed an Answer addressing the Petitioner's Petition for Writ of Habeas Corpus. This pleading specifically answered most of the allegations raised by the Petitioner, and is set out in III.C., *infra*.

11

β III

## E. MEMORANDUM IN RESPONSE TO STATE'S ANSWER TO THE PETITION

On May 21, 2013, the Respondent, by counsel, filed a Memorandum In Response To State's Answer To The Petition.

## F. THE OMNIBUS HABEAS CORPUS HEARING

The omnibus habeas corpus hearing was held on May 6, 2013. On that date, the court reviewed the *Losh* checklist with the Petitioner, and informed him of the finality of his Omnibus Habeas Corpus Petition.

The Petitioner was first called as a witness on his behalf by Mr. Cassell. The Petitioner testified that he was locked up pending trial and during the course of the case became aware of the fact that his child was saying he had committed certain acts. He believed that she was fabricating this information at the behest of her mother and her mother's live-in boyfriend. During this time he was incarcerated in Virginia for crimes against nature, serving a 1-5 year sentence for engaging in an incestuous relationship with his sister. He stated that about six (6) months before he was due to be released his ex-wife and her boyfriend "came up with these allegations". He testified as to why he believed that his ex-wife's boyfriend was behind this story.

He also testified that there was another family member in the residence, his nephew, who he believed could have potentially been abusing his child. He has received unsolicited letters from the victim. He told his attorneys about these things and asked that they investigate them, but they refused to do so because they said that it wouldn't matter. He denied committing any sexual acts with the potential 404(b) witnesses. He stated that his troubles in Virginia were also the result of fabrication. He further believed that his attorneys failed to investigate his assertion that some of the alleged conduct

12

actually happened in Virginia and not in West Virginia. He was confused about the use of 404(b) evidence. Although he took the plea that was offered, he testified that in retrospect he would have preferred to have the information he requested before he took the plea. He stated that he signed the plea agreement because there was no way to win.

The Petitioner also stated that he has trouble reading and a low vocabulary. He has been diagnosed as having panic attacks and anxiety. He also testified about the medicine he takes because of his psychiatric issues. He receives SSI benefits. He remembered being evaluated by Dr. Clayman. He also stated that his pre-sentence investigation was inaccurate because it stated that while his family would no longer have anything to do with him, he had family members in West Virginia who would provide him the opportunity for alternative sentencing. He asserted that he was actually innocent of the crimes charged and that he was the victim of adverse pre-trial publicity.

Mr. Cassell reviewed the *Losh* checklist with the Petitioner to make sure that all of the issues that he raised were either addressed in the pleadings or at the hearing. He particularly claimed that his attorneys did not talk to people to counteract all the issues that he had testified about during his hearing. He testified that he was told that if he didn't take the plea he would never see the light of day and that this was the best plea they could get. He asserted his innocence. Finally, he testified on direct that the alleged victim did not refer to any type of sexual penetration by him and that this was a required element of the crime with which he was charged.

Ms. Williamson cross-examined the Petitioner about his testimony. She reviewed the victim's assertions that the sexual abuse occurred at two locations in Mercer County, West Virginia. He understood that he was facing a 182 to 430 year prison sentence. He

13

B113

also understood that he was charged with penetrating his daughter's vagina and anus with his penis and also digitally penetrating her. He further understood that she claimed that he forced her to perform mutual oral sex with him.

Although he admitted stating that his daughter and he touched each other, that was not really true because his attorneys told him that if he did not give an explanation of why he did the crimes the guilty plea would not be accepted. When asked if he was lying under oath he said that he wasn't the only one lying. He has no evidence that his nephew abused his daughter or that his daughter lied about what she says he did to her.

On examination by the Court, he admitted that he entered a guilty plea to crimes against nature in Virginia and that in 2002 he was competent to enter a plea in Virginia for crimes that took place in 2001.

The State called William O. Huffman, Esq. as a witness. Mr. Huffman testified that when he represented Mr. ██████ in 2008 he had been practicing law since 1994 doing criminal defense work. He investigated the allegations against the Petitioner by having Ted Jones interview witnesses who were disclosed both through discovery and by the Petitioner. He believed that this process also included the 404(b) witnesses. He remembered the Petitioner alleging that someone else in his family had molested his daughter but did not remember if there was any evidence to that effect. He said that he had extensive communication with the Petitioner about his options and that the decision was ultimately made by the Petitioner. He stated that no one told the Petitioner to misrepresent anything, but he would have to have some acceptance of responsibility for his actions. On cross-examination Mr. Huffman stated that he could not recall doing an analysis of the potential admissibility of 404(b) evidence, but assumed that it was done.

14

He did not recall being told that there were witnesses who would testify about the Petitioner's good relationships with children.

The Court reviewed Mr. Huffman's bill concerning his activities in representing the Petitioner.

Derrick Lefler, Esq. was also called as a witness by the State. He was co-counsel for the Petitioner at the time of this plea. He had been practicing law about 20 years at the time of his testimony. He remembered his work on the case and discussing this matter with Mr. Huffman and the Petitioner. He didn't believe that the Petitioner had any trouble in understanding what he was saying and did not believe that there was anything that would necessitate him being evaluated for his competency. He wasn't aware of any information that would have raised a concern of lack of criminal responsibility. He denied telling the Petitioner to say anything that wasn't true. On cross-examination he admitted that undermining the 404(b) evidence would have helped his position in theory, but it wouldn't have necessarily worked in this instance. He understood that the 404(b) witnesses were family members. He doesn't recall whether any investigation was done concerning the alleged abuse of the Petitioner's daughter by his nephew nor does he remember investigating the ex-wife's boyfriend because he was not the focus of the Petitioner's concern or theory at the time of his plea. He thought that the Petitioner believed at the time of the plea that his daughter wanted to stay with her grandparents and did not want to return to him. He doesn't recall if the Petitioner's trial defense attempted to determine the location of all the offenses. The Petitioner did not say anything that would have led counsel to ask for a mental health evaluation. He stated that they went through the plea papers personally with the Petitioner. Finally, on re-direct he stated that

15

B11S

part of the plea agreement was that the State would not prosecute the Petitioner for the alleged 404(b) conduct.

## III.   DISCUSSION

### A.  HABEAS CORPUS DEFINED

Habeas Corpus is a "suit wherein probable cause therefore being shown a writ is issued which challenges the right of one to hold another in custody or restraint." Syl. Pt. 1. *State ex rel. Crupe v. Yardley*, 213 W. Va. 335, 582 S.E.2d 782 (2003).   The issue presented in a Habeas Corpus proceeding is "whether he is restrained of his liberty by due process of law." *Id. At* Syl. Pt. 2.  "A Habeas Corpus petition is not a substitute for writ of error[1] in that ordinary trial error not involving constitutional violations will not be reviewed." *Id. At* Syl. Pt. 3.

### B.  THE AVAILABILITY OF HABEAS CORPUS RELIEF

In *State ex rel. McCabe v. Seifert*, the West Virginia Supreme Court of Appeals delineated the circumstances under which a post-conviction Habeas Corpus hearing is available, as follows:

(1) Any person convicted of a crime and

(2) Incarcerated under sentence of imprisonment therefore who contends

(3) That there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State or both, or

(4) That the court was without jurisdiction to impose the sentence, or

---

[1] A writ of error issued by an appellate court to the court of record where a case was tried, requiring that the record of the trial be sent to the appellate court for examination of alleged errors.

B 116

(5) That the sentence exceeds the maximum authorized by law, or

(6) That the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common-law or any statutory provision of this State, may without paying a filing fee, file a petition for a writ of Habeas Corpus Ad Subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence, or other relief. 220 W. Va. 79 640 S.E.2d 142 (2006); W. Va. Code §53-4A-1(a)(1967)(Repl. Vol. 2000).

Our post-conviction Habeas Corpus statute, W. Va. Code §53-4A-1 *et seq.*, "clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction Habeas Corpus proceeding during which he must raise all grounds for relief which are known to him or which he could, with reasonable diligence, discover." Syl. Pt. 1, *Gibson v. Dale*, 173 W. Va. 681, 319 S.E.2d 806 (1984). At subsequent Habeas Corpus hearings, any grounds raised at a prior Habeas Corpus hearing are considered fully adjudicated and need not be addressed by the Court. *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

Yet, some limited exceptions apply to this general rule: "[a] prior omnibus Habeas Corpus hearing is *res judicata* as to all matters raised and as to all matters known or which with reasonable diligence could have been known; however an applicant may still petition the court on the following grounds: (1) ineffective assistance of counsel at the omnibus Habeas Corpus hearing; (2) newly discovered evidence; (3) or, a change in the

17

B 17

law, favorable to the applicant, which may be applied retroactively." Syl. Pt. 4, *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).[2]

A Habeas Corpus proceeding is civil in nature. "The general standard of proof in civil cases is preponderance of the evidence." *Sharon B.W. v. George B.W.*, 203 W. Va. 300, 303, 507 S.E.2d 401, 404 (1998).

The West Virginia Supreme Court of Appeals has articulated the way for a Circuit Court to review Habeas Corpus petitions: "Whether denying or granting a petition for a writ of Habeas Corpus, the circuit court must make adequate findings of facts and conclusions of law relating to each contention advanced by the petitioner, and state the grounds upon which the matter was determined." *Coleman v. Painter*, 215 W. Va. 592, 600 S.E.2d 304 (2004).

## C. FINAL LIST OF GROUNDS ASSERTED FOR ISSUANCE OF A WRIT OF HABEAS CORPUS, AND THE COURT'S RULINGS THEREON

The Court has carefully reviewed all of the pleadings filed in this action, the transcript of the omnibus hearing, the Court files in the underlying criminal action, the transcripts of the plea and sentencing hearings, and the applicable case law. The Court has also reviewed the *Losh* checklist filed by the Petitioner with his Petition for Writ of Habeas Corpus.

---

[2] On June 16, 2006, the West Virginia Supreme Court of Appeals held that a fourth ground for Habeas relief may exist in cases involving testimony regarding serology evidence. To summarize, the Court held as follows:

A prisoner who was convicted between 1979 and 1999 and against whom a West Virginia State Police Crime serologist, other than a serologist previously found to have engaged in intentional misconduct, offered evidence may bring a petition for writ of Habeas Corpus based on the serology evidence even if the prisoner brought a prior Habeas Corpus challenge to the same serology evidence and the challenge was finally adjudicated.

*In re Renewed Investigation of State Police Crime Laboratory, Serology Div.*, 633 S.E.2d 762, 219 W. Va. 408 (2006).

18

β118

The Court finds that the Petitioner did not present any evidence or arguments on the following issues raised in the *Losh* checklist: refusal to subpoena witnesses, failure of counsel to take an appeal, and Constitutional errors in evidentiary rulings, so the same are dismissed and held for naught.

The matters before this Court for review are:

1. Whether trial counsel were ineffective with regard to the Petitioner's defense to the charges on the following grounds:

   a. In conducting plea negotiations;

   b. Failure to investigate the Petitioner's mental state.

2. Whether the Petitioner's guilty plea was not knowingly, intelligently, and voluntarily made.

3. Whether the Petitioner received a disproportionate sentence.

4. Whether the Petitioner's Federal and State Constitutional rights were violated by the indictment.

5. Whether the other matters raised by Petitioner in this proceeding have merit, specifically, was the Petitioner actually innocent?


## 1. WAS COUNSEL INEFFECTIVE?[3]

**a. The Petitioner's Argument:**

PETITIONER'S FEDERAL AND STATE CONSITUTIONAL RIGHTS WERE VIOLATED BY TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE

The West Virginia Supreme Court has recognized that the Sixth Amendment to the Constitution of the United States and Article 3, Section 14 of the Constitution

---

[3] All Exhibits referenced in this section of the order relate to those filed with the pleadings of the parties.

of West Virginia mandate that a Defendant, in a criminal proceeding receive "competent and effective assistance of counsel." *State ex. Rel. Strogen v. Trent* 469 S.E.2d 7, 9-10 (W.Va. 1996) (numerous citations omitted).

Accordingly to the Supreme Court, claims of ineffective assistance of counsel are to be governed by the two prong test established by the United States Supreme Court in *Strickland v. Washington*, 466 US 668 (1984): (1) counsel's performance was deficient under an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* at 12. The West Virginia Supreme Court has established that in reviewing counsel's performance, Courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance. *Id.* "Thus a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." *Id.* (citations omitted).

Importantly, the West Virginia Supreme Court has recognized, just as the United States Supreme Court recognized earlier, that any presumption that counsel's conduct does fall within the range of reasonable professional assistance does not apply where counsel's strategic decisions are made after an inadequate investigation." *State ex rel. Vernatter v. Warden,* 528 S.E.2d 207, 213 (W. Va. 1999), citing *State ex rel. Daniel v. Legursky,* 465 S.E. 2d 416, 422 (W. Va. 1995).

The Court has stated that "counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary,"

20

*State ex rel. Daniel v. Legursky* 465 S.E. 2d 416, 422 (W. Va. 1995). The West Virginia Supreme Court has recognized that in applying the standard, "courts . . . have found no difficulty finding ineffective assistance of counsel where an attorney neither conducted a reasonable investigation nor demonstrated a strategic reason for failing to do so." *Id.* at 422.

In this case, counsel was ineffective in the following ways:

## 1. TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO PETITIONER'S DEFENSE TO THE CHARGES

Trial counsel was ineffective in investigating possible reasons for L.L.S. to fabricate her claims that Mr. ███ molested her. In addition, counsel failed to adequately explore R. 404(b) evidence that the state sought to introduce to undermine its significance. Finally, counsel failed to fully explore jurisdictional issues as to where the alleged crimes occurred. As some crimes allegedly occurred in Virginia, this court would have lacked jurisdiction to hear them.

Mr. ███ has always maintained his innocence to these crimes. If Mr. ███ is innocent, then logically L.L.S. must be lying. Mr. ███ has raised with counsel numerous possibilities as to why L.L.S. might lie. The first was that his ex-wife's boyfriend Mark was trying to get Mr. ███ out of the picture. Mr. ███ had raised these concerns from the beginning of the case during the course of his initial interview with police. (Ex. 1 at 34-35). This possibility, to the best of Petitioner's knowledge, was never investigated. In addition, it is possible that L.L.S. was abused by someone else. Mr. ███ son was allegedly abused by his nephew in 2003. Mr. ███' wife took the child to St. Lukes Hospital for evaluation. This issue was also, to the best of Petitioner's knowledge, never investigated. Mr. ███ also contends that the alleged victim

21

continued to have contact with him long after the alleged abuse, even when Mr. ████ was no longer in the home. Those actions seem inconsistent with the claims of sexual abuse. Again, to the best of Petitioner's knowledge, this issue was not fully investigated.

In this case, the investigation included alleged incidents in Virginia. There is no evidence in the record of counsel's attempt to delineate and differentiate the acts that allegedly occurred in Virginia from those in West Virginia. (*See* West Va. State Police, Report of Criminal Investigation, portions attached hereto as Ex. 10).

In addition, counsel failed to fully investigate the alleged R. 404(b) evidence intended to be offered by the state. On March 27, 2009, the prosecution filed its "Notice of Intent to Move the Court for the Admission of 404(b) Evidence." (*See* Notice attached hereto as Ex. 6). That notice identified five persons that were allegedly the victim of "violent sexual contact by defendant:" A.W., H.W., Elmer Jean Johnson, Dana ████, and Olla ████ (*See* Ex. 6). Trial counsel filed a timely "Objection and Motion to Exclude 404(b) Evidence." (*See* Objection attached as Ex. 7). That objection noted the significant investigation required to address R. 404(b) issues. (Ex. 7 at 2). However, despite this realization of the need for extensive investigation, it appears that little investigation was actually done. Instead of having the hearing on the R. 404(b) evidence, a plea was entered on the date scheduled for the hearing. (*See* Docket sheet attached as Ex. 9 at entries for 3-31-09 and 4-21-09). Mr. ████ asserts that the R. 404(b) evidence was unlikely to be presented at trial as alleged victims A.W. and H.W. were allegedly extremely young at the time of the alleged offenses and had apparently received no therapy and provided no corroborating evidence in the course of treatment. (*See* Memorandum 4/9/09 attached as Ext. 8). Further, Elmer Jean Johnson did not appear to

22

be cooperating. Dana ████ had previously refused to testify about a Giles County incident such that the criminal charges related thereto were never pursued. (*See* Ex. 1 at 22 and PSI). The crime committed against Olla ████ involved an adult, not a child, and was of a different fundamental nature than the charges in this case. (*See* Virginia PSI attached to PSI in this case).

## 2. TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO PLEA NEGOTIATIONS

Because of trial counsel's inadequate investigation, Mr. ████ contends that their advice concerning taking the plea or "never seeing daylight again" was ill and inadequately informed.

Recently, the United States Supreme Court affirmed the critical nature of effective client assistance in plea negotiations. According to the Court, defendants have a Sixth Amendment right to counsel that extends to the plea bargaining process. *Lafler v. Cooper*, 132 S.Ct. 1376, 1384, 182 L.Ed.2d 398, 406, 80 U.S.L.W. 4244, ____ (2012). This arises from the fact that "criminal justice today is for the most part a system of pleas, not a system of trials. Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas." *Id.* at 1388, 411, ____." In today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Missouri v. Frye*, 132 S.Ct. 1399, 1407, 182 L.Ed.2d 379 390, 80 U.S.L.W. 4253, ____ (2012). The Supreme Court concluded that "the right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences." *Lafler v. Cooper*, 132 S.Ct. 1376, 1388, 182 L.Ed.2d 398, 411, 80 U.S.L.W. 4244, ____ (2012).

23

During plea negotiations defendants are constitutionally entitled to the effective assistance of competent counsel. The Court applied the *Strickland* standard to determine if there was ineffective assistance. The meet the *Strickland* test with regard to pleas, there must be a showing that the representation fell below an objective standard of reasonableness and the outcome of the plea process would have been different with competent representation. *Id.* at 1384, 407, ____. The West Virginia Supreme Court of Appeals has also confirmed the requirement of effective assistance of counsel during the plea bargaining process. *E.g., Becton v. Hun,* 205 W. Va. 139, 516 S.E.2d 762 (1999).

Here, trial counsel was ineffective for failing to undermine the state's case through a thorough investigation. Thus, all advice given was based on an inadequate foundation.

### 3. TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO MR. ███████ MENTAL STATE

During the police questioning of Mr. ███████ at the Dilwynn Correctional Facility in Virginia, Mr. ███████ confirmed that the prison had tried "to get me to take medicines and I told them I would deal with my psychological problems on my own because the medicine they've got there I've seen it drive people crazy." (*See* Ex. 1 at p. 6). Mr. ███████ candidly discussed his psychiatric diagnoses over the years and receipt of SSI for such issues. (Ex. 1 at 26-27). Further, as mentioned, before, Mr. ███████ cannot write effectively and is functionally illiterate. Trial counsel's ineffectiveness in having Petitioner's competency evaluated is sufficient to overturn a guilty plea if there was sufficient evidence that competency was an issue. *E.g., Kessick v. Bordenkircher,* 170 W. Va. 331, 294 S.E.2d 134 (1982).

## b. The State's Response:

PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS WERE NOT VIOLATED BECAUSE TRIAL COUNSEL WERE NOT EFFECTIVE

Petitioner can not meet either component of the Strickland test. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)[4], the Supreme Court defined the burden a defendant must carry in order to successfully bring an ineffective assistance of counsel claim:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, S.Ct. at 2064.

> To establish that counsel's conduct was deficient, the defendant must show counsel's specific acts or omissions which, viewed from the perspective of counsel at the time of trial, fell below the standard of reasonable professional assistance." *United States v. Payne*, 741 F.2d 887, 891 (7th Cir. 1984) (citing *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066). Acts or omissions of counsel are outside the range of professionally competent assistance when "counsel's representation [falls] below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064-65. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of

---

[4] Adopted by *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

25

B125

reasonably professional assistance; that is, that defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "[I]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Id.* at 689, 104 S.Ct. at 2065 (citation omitted) (emphasis added).

Prejudice to the defendant, the second element necessary to a finding of ineffective assistance, will be found only if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

At the guilty plea hearing, petitioner testified under oath that he was satisfied with the manner in which his attorneys represented him: Tr. 4-21-2009 guilty plea hearing, pp. 59-60. Petitioner further testified that there was nothing that his attorneys failed to do in representing him nor did they do anything petitioner did not want them to do. *Id.* p. 60. Moreover, petitioner stated under oath that he had no complaints about how his attorneys represented him. *Id.*

### 1. TRIAL COUNSEL WAS NOT INEFFECTIVE WITH REGARD TO THE PETITIONER'S DEFENSE TO THE CHARGES

Petitioner claims his attorneys were ineffective in their representation because they failed to investigate the case and that their ineffectiveness rose to a violation of his Sixth Amendment right to counsel. Petitioner claims trial counsel failed to investigate possible reasons for his daughter, L.L.S., to fabricate her statements that he sexually abused and assaulted her. Petitioner also claims that counsel failed to explore 404(b) evidence that the State sought to introduce to undermine its significance.

26

βⅠλϐ

Petitioner's claims are unfounded and not supported by any facts. Petitioner's bare assertions that his daughter may have lied about her father sexual assaulting her because petitioner's "ex-wife's boyfriend was trying to get petitioner out of the picture" and "it was possible that his daughter was abused by someone else" because petitioner's "son was allegedly abused by his nephew in 2003" and allegedly "the victim [petitioner's daughter] continued to have contact with [petitioner] long after the alleged abuse" are merely irrelevant ridiculous possibilities. There was and is not a scintilla of evidence that petitioner's daughter was abused by petitioner's ex-wife's boyfriend. Petitioner's son's alleged abuse is irrelevant to whether petitioner abused his own daughter. Even if true and for whatever reason, is it that difficult to imagine a daughter contacting her father after he sexually abused her as a little girl?

Petitioner's claim that trial counsel failed to fully investigate the 404(b) evidence proffered by the state is also without merit. It is possible that none of the 404(b) evidence would have been admitted. Nevertheless, trial counsel were provided copies of a memorandum as well as digital recordings of A.W. and H.W., the two proffered 404(b) witnesses identified at the April 13, 2009 pre-trial conference. A.W. identified petitioner as her uncle and said that he would baby sit her and her sister H.W. A.W. stated that petitioner would take her into his bedroom and touch her vagina and force her to masturbate him. This occurred multiple times when she was between age four and six. Petitioner threatened to kill her family and told her that welfare would take her away if she told. H.W. identified petitioner as her uncle and that he would babysit her and her sister A.W.

27

BI27

H.W. stated petitioner touched her "privates" and pointed between her legs and made her masturbate him. Petitioner threatened to kill her parents if she told and that welfare would take her away. According to H.W., this occurred at petitioner's residence at Breeze Hill Mobile Home Park when H.W. was four or five years old.

No where (sic) does petitioner identify what specific facts were not properly investigated or how such facts, if properly investigated, would have changed his mind about entering a guilty plea. Further, petitioner does not identify which witnesses were not properly interviewed or how those witnesses, if properly interviewed, would have testified differently such that petitioner would not have decided to plead guilty. Finally, petitioner does not identify what discovery was not reviewed, which discovery had it been reviewed, would have changed petitioner's decision to plead guilty.

Petitioner has failed to meet even the first prong of the *Strickland* test because it is clear from the record that trial counsel's performance was not deficient under an objective standard of reasonableness. Also, the second prong of *Strickland* clearly can not be met as there is no reason to believe that the outcome – petitioner's decision to plead guilty – would have been any different. Lastly, "there is a strong presumption in favor of the regularity of court proceedings and the burden is on the person who alleges irregularity to show affirmatively that such irregularity existed. *Syl. Pt. 2, State ex rel Scott v. Boles,* 150 W. Va. 453 (1966) as quoted in *Kees v. Lori Nohe, Warden,* WVSCA Memorandum Decision No. 11-1465 (issued 01-14-2013), Judge Wilkes' Order

28

ß|२ୁୁ

Denying Amended Petition for Writ of Habeas Corpus, Berkeley County Circuit Court Civil Action No. 08-C-1034 (underlying Criminal Action 04-F-102) pp. 9-11.

## 2. TRIAL COUNSEL WAS NOT INEFFECTIVE WITH REGARD TO PLEA NEGOTIATIONS

Respondent alleges that trial counsel was ineffective for failing to conduct a thorough investigation which caused counsel's advice (derived from such lack of investigation) to take a plea to amount to a violation of his Sixth Amendment right to counsel. This specious claim begs the question that trial counsel failed to conduct a thorough investigation. Additionally, at the April 13, 2009 pre-trial conference, the parties announced that plea negotiations were ongoing. Under the indictment, petitioner was facing the possibility of serving 182 to 430 years in prison. He acknowledged this and entered into a best interest plea that exposed him to 26 to 60 years in prison "pretty much" in order to avoid the possibility that a much higher sentence might be imposed if he went to trial and were found guilty.[5] Tr. 4-21-2009 guilty plea hearing, pp. 55 – 58.

## 3. TRIAL COUNSEL FOR PETITIONER WAS NOT INEFFECTIVE WITH REGARD TO PETITIONER'S MENTAL STATE

Petitioner fails to allege any valid constitutional violation. Petitioner voluntarily entered a guilty plea as reflected in the plea colloquy and the plea papers petitioner signed. *See* Tr. 4-21-2009 guilty plea hearing. Petitioner can not meet either component of the *Strickland* test. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

---

[5] And more or less because he said he was guilty. Tr. 4-21-2009 guilty plea hearing pp. 52-53.

29

β129

Even a cursory glance at the January 31, 2008 statement petitioner gave to WVSP Sgt. Clemons and Tpr. Fields (while petitioner was incarcerated for raping his sister) reveals a pretty high functioning individual with an understanding of the allegations against him and knowledge of legal proceedings.

At a status hearing held February 4, 2009, the petitioner and trial counsel were notified that if defense desired a psychological evaluation it must request the same by February 11, 2009. At this time, trial counsel were seasoned veterans of criminal defense. They obviously concluded, based on their years of experience, that a psychological evaluation was not necessary.

On May 27, 2009 and June 2, 2009, prior to sentencing, petitioner underwent a forensic psychological evaluation to assist the Court in determining sentence as provided in WV Code 62-12-2(e). Dr. Clayman determined that petitioner

> "was alert and aware of his surrounding....he was cooperative and responsive to questioning. His speech was logical, organized, and coherent. There were no indications of delusional thought content. Mood and affect were within normal limits. His vocabulary, wood usage, and understanding of information in his background history (e.g. medical and *legal concepts*) suggested higher cognitive and intellectual functioning than his standardized test results reflect."

Clayman & Associates Forensic Psychological Evaluation 6-15-2009, p. 9 (emphasis added).

Dr. Clayman concluded that "it appears that Mr. ███ is exaggerating his claims of mental illness, rendering an accurate diagnosis, if any, impossible. Similarly, although Mr. ███ probably has some legitimate intellectual deficits as the result of his limited education background, it appears that he exaggerated these impairments, as well. *Id.* at 11-12.

30

### c. Findings of Fact and Conclusions of Law:

The Court makes the following specific findings of fact and conclusions of law regarding the Petitioner's claim of Ineffective Assistance of Counsel:

(1) The Court **FINDS** that the West Virginia Supreme Court of Appeals stated the test to be applied in determining whether counsel was effective in *State v. Miller:*

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 764 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), syl. pt. 5.

(2) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

> Where counsel's performance attacked as ineffective arises from occurrence involving strategy, tactics, and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of the accused. *State ex rel Humphries v. McBride*, 220 W.Va. 362, 645 S.E.2d 798 (2007) syl. pt. 5. In accord, Syllabus point 21, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974).

(3) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

> [i]n reviewing counsel's performance, courts must apply an objective standard and determine whether,

31

β131

in light of all the circumstance, the identified acts omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995) syl. pt. 6.

(4) The Court finds that on the issue of competency to stand trial, the West Virginia Supreme Court of Appeals held in *State v. Milam*, 159 W.Va. 691, 226 S.E.2d 433 (1976), that:

> No person may be subjected to trial on a criminal charge when, by virtue of mental incapacity, the person is unable to consult with his attorney and to assist in the preparation of his defense with a reasonable degree of rational understanding of the nature and object of the proceedings against him. Syl. Pt. 1

(5) The Court finds that the West Virginia Supreme Court of Appeals has also held that:

> It is a fundamental guarantee of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent. *State v. Hatfield*, 186 W.Va. 507, 413 S.E.2d 162 (1991), Syl. Pt. 6, following *State v. Cheshire*, 170 W.Va. 217, 292 S.E.2d 628 (1982). Syl. Pt. 1

(6) The Court finds that the West Virginia Supreme Court of Appeals has also held that:

> When a trial judge is made aware of possible problem with defendant's competency, it is abuse of discretion to deny a motion for a psychiatric evaluation. *State v. Hatfield*, supra at Syl. Pt. 2,

32

B132

citing Syl. Pt. 4, in part, *State v. Demastus*, 165 W.Va. 572, 270 S.E.2d 649 (1980).

(7) The Court finds that the West Virginia Supreme Court of Appeals has also held in *State v. Sanders*, 209 W.Va. 367, 549 S.E.2d 40 (2001):

> Importantly, since the right not to be tried while mentally incompetent is subject to neither waiver nor forfeiture, a trial court is not relieved of its objection to provide procedures sufficient to protect against the trial of an incompetent defendant merely because no formal request for such has been put forward by the parties . . . In other words, a trial court has an affirmative duty to employ adequate procedures for determining competency once the issue has come to the attention of the Court, whether through formal motion by one of the parties or as a result of information that becomes available in the cause of criminal proceedings.

(8) The Court finds that the West Virginia Supreme Court of Appeals has also confirmed its process for determining whether a broad inquiry into a defendant's mental competency is constitutionally required in *Sanders*:

> Evidence of irrational behavior, a history of mental illness or behavioral abnormalities, previous confinement for mental disturbance, demeanor before the trial judge, psychiatric and lay testimony bearing on the issue of competency, and documented proof of mental disturbance are all factors which a trial judge may consider in the proper exercise of his (or her) discretion (to order an inquiry into the mental incompetence of a criminal defendant.) *Sanders*, Syl. Pt. 6, following Syl. Pt. 5, *State v. Arnold*, 159 W.Va. 158, 219 S.E.2d 922 (1975).

33

B133

25. Are there any words in the Indictment that you do not understand? **No**
26. If there are, what are they?

27. Is your recollection impaired in any way? **No**

35. Do you have any evidence or information which you wish to assert to establish that you are not guilty of the offense to which you seek to plead? **No**

45. Have you discussed the matters and things which cause you to believe that you are guilty with you (sic) attorney, **Mr. Lefler and Mr. Huffman?** **Yes**

46. Have you discussed with your attorney every fact or circumstance which would have any bearing upon your guilt or innocence, that is, have you told your lawyer everything you know about this case? **Yes**

65. Are you satisfied with the services your attorney has given you in this case? **No** Is there anything which he has done or which he has failed to do for you which you desire to discuss with the Court in private before your plea is accepted? **No**

(13) The Court finds that the following occurred during the plea colloquy on April 21, 2009;[6]

> THE COURT: Alright. Let me ask this of both of you, Mr.
>
>  and Mr. Whitlow.
>
> Gentlemen, are you each satisfied with the manner in which
>
> your respective attorneys; Mr. Huffman and Mr. Lefler for
>
> you Mr. ⬛ —
>
> MR. ⬛ Yes, Your Honor.
>
> THE COURT: -- Mr. Fuda for you Mr. Whitlow, have
>
> represented you in your respective case?

---

[6] The Court took simultaneous guilty pleas from two individuals with their consent (*See* Transcript of plea hearing of April 21, 2009, at pp. 1-4).

B136

Mr. ██████?

MR. ██████: Yes, Your Honor.

MR. WHITLOW: Yes, sir.

THE COURT: Alright.

Do each of you feel there is anything . . . is there anything that either of you feel that your respective attorneys failed to do in representing you?

MR. ██████: No, Your Honor.

MR. WHITLOW: No, sir.

THE COURT: Did your attorneys do anything in your respective case you did not want them to do?

MR. ██████: No, Your Honor.

MR. WHITLOW: No, sir.

THE COURT: Do either of you have any complaints at all about how your attorneys have represented you in your case?

MR. ██████: No, Your honor.

MR. WHITLOW: No, sir.

(*See* Plea Transcript of April 21, 2009, at p. 59, L: 19 – p. 60, L: 23)

(14) The Court finds that the following also occurred during the plea colloquy:

37

THE COURT: Do you have any history of mental illness, alcohol or drug addiction or any problem like that that affects your ability to understand what you're doing here today?

MR. ████████: No, Your Honor.

MR. WHITLOW: No, sir.

THE COURT: Is there – Gentlemen, I'll start with Mr. Huffman and Mr. Lefler, is there any sort of insanity, intoxication, diminished capacity defense in your client's case?

MR. HUFFMAN: No, Your Honor.

MR. LEFLER: No, sir.

(*See* Plea Transcript of April 21, 2009 at p. 38, L: 4 – 15)

(15) The Court finds that between them, Petitioner's trial counsel spent 69 hours representing the Petitioner during his Circuit court proceedings.

(16) The Court finds that the Petitioner's counsel engaged a private investigator to assist in their preparation of his case.

(17) The Court finds that Mr. Lefler specifically testified that there was no reason to have the Petitioner evaluated for competency or criminal responsibility:

Q       Did you have thoughts of having him evaluated for competency?

38

A    I did not. I did not find that I saw anything that I felt would necessitate that or that that was an issue that was presented. Our communications with him were such that I understood what he was trying to convey and he understood what we were conveying to him. He did not, in my recollection, every (sic) express any specific difficulty in that respect where I felt that he did not understand what the process he was engaged in was and who the participants were and what the various roles would be or ultimately what standards would be applied to his case. I just did not at any point feel like he was challenged in that respect.

Q    Did you think about whether or not he had been criminally responsible at the time he allegedly committed these acts?

A    I did not — - I was not aware of any information that would have raised that concern. He did not indicate anything in our conversations that lead me to have the concern. He was adamant in his denial that this just wasn't true and it was a fabrication. So I -- it wasn't an issue that was raised in my head.

(See Omnibus Habeas Corpus Transcript of May 6, 2013 at p. 78, L: 16 – p. 79, L: 18)

And

39

B 139

Q       Did you know about Mr. ████ prior mental history with regard to, you know, refusing medical — refusing medication or receiving Social Security Disability for mental health issues?

A       Yes, sir, in general. And as refreshed by his recollection, it appears to be an anxiety and personality disorder that perhaps is his affliction. I did not see anything in my communications with Mr. ████ or conferences with him or any other information that lead me to question his competence to stand trial. If I had, I certainly would have asked for an evaluation.

Q       Those evaluations are fairly freely given by the Courts here in Mercer County?

A       They are. Certainly they are much more the practice today than they were back in 2008, I would say.

Q       And you will agree with me that Mr. ████ has significant literacy issues, difficulty in writing and reading?

A       I don't know about his difficulty in reading. Certainly his writing is not fabulous. At the same time, we did not at any time just plunk down a stack of papers and say here, read these. We went through the information in this case with him personally and in detail and probably

40

made a point to be more particular with that in this case just because I did recognize he wasn't, to say, necessarily the sharpest knife in the drawer. So we wanted to make sure that he understood what we were doing.

(*See* Omnibus Habeas Corpus Transcript of May 6, 2013 at p. 87, L: 21 – p. 89, L: 6)

(18) The Court finds that the Petitioner was evaluated by David Clayman, Ph. D., on June 15, 2009, who reported as follows:

## MENTAL STATUS

Mr. ████ was alert and aware of his surroundings. He was dressed in standard-issue Regional Jail clothing and was appropriately groomed. Mr. ████ expressed his belief that he would not receive a fair evaluation because of the nature of the alleged offenses. Nevertheless, he was cooperative and responsive to questioning. His speech was logical, organized, and coherent. There were no indications of delusional thought content. Mood and affect were within normal limits. His vocabulary, word usage, and understanding of information in his background history (e.g., medical and legal concepts) suggested higher cognitive and intellectual functioning than his standardized test results reflect. No aberrations of sensation or perception were evident. There were no indications of current suicidal or homicidal ideation, although there is a history of prior suicide attempts. Several horizontal scars were visible on both forearms, which he asserted were the result of a previous suicide attempt.

## PSYCHOLOGICAL TESTING

According to the Supervised Psychologist who administered the psychological assessments, Mr. ████ was talkative and appeared cooperative, although his overall effort was variable across different tasks. Psychomotor activity was within normal limits. Despite not having his glasses available, he denied problems seeing the visual stimuli.

*Cognitive/Intellectual*

41

ß|४|

On a test of response style (VIP), Mr. ████ responded in a manner that suggests an intentional effort to misrepresent himself as impaired on the nonverbal subtest, while he responded in a random manner on the verbal subtest without regard for item content. The latter finding may reflect lack of effort or may be the result of illiteracy. On a test addressing attempts to malinger memory impairment (TOMM), Mr. ████ responded similarly to most adults who are not attempting to feign memory impairment. Given the aberrant response pattern on the VIP, the intellectual assessments must be interpreted with extreme caution, as they probably underestimate his true abilities. With this in mind, intellectual functioning was estimated to be in the Severely Impaired range based on his WASI Full Scale IQ score of 68. However, he performed in the Low Average on nonverbal tasks (Performance IP = 80) and in the Severely Impaired range on verbal tasks (Verbal IQ = 60). On the COGNISTAT, there was no indication of severe cognitive impairment. All subtests were within normal limits with the exceptions of those measuring short-term memory and verbal reasoning, which were mildly impaired. Reading abilities were estimated to be at the third grade level (WJ-III).

### Psychopathology/Emotional Adjustment

Because it was suspected that Mr. ████ verbal abilities were underestimated by formal testing and because his oral comprehension score on the WJ-III was at the ninth grade level, the objective assessments were attempted by auditory administration. Responses to the PAI suggested that he attended to item content and responded in a consistent manner, supporting the impression that he had the ability to understand the items. However, it does appear that he attempted to exaggerate problems and complaints while at the same time responding defensively to items regarding substance use. Consistent with his exaggerated response style, he endorsed a wide range of symptoms and complaints that would suggest severe impairment in functioning. Specifically, he claimed thinking and concentration problems, depression, social withdrawal and estrangement, impaired reality testing, suspiciousness, mistrust, anxiety, and somatic complaints. Personality traits suggestive of unstable relationships, antisocial behaviors, and problems related to drug use were endorsed. His profile further suggested that he does not have a well-established identity or stable self esteem. Tending to be self-centered, he avoids closeness in relationships and can be exploitive.

42

B14λ

# DISCUSSION

Mr. ███ is a 43-year old man who has pleaded guilty to the above charges as part of a plea agreement. Despite his guilty plea, Mr. ███ maintains his innocence on all counts, and insists that he only accepted the agreement because it was in his best interest to do so. Mr. ███ described a long history of aberrant behavior, beginning during childhood. Although he was raised in an intact family, his early family history was marked by significant dysfunction that included exposure to his parents' alcohol abuse and alleged physical, sexual, and emotional abuse. By his own report, Mr. ███ was introduced to illicit substances when he was six years old, and he continued abusing substances into his adulthood. His early life experiences appear to have fostered an antisocial belief system that resulted in behaviors consistent with Conduct Disorder as a child that evolved into Antisocial Personality Disorder as an adult, as evidenced by his history of numerous legal offenses.

Although he alleges significant mental health problems that have contributed to chronic disability, his mental health treatment history appears to be quite limited. By his report, he was treated by a psychiatrist as a child due to his conduct problems and was hospitalized one time for observations when he attempted suicide during incarceration. His remaining treatment has involved a brief trial of antidepressant medications and prolonged use of benzodiazepine medications prescribed by his primary care physician. The history is not consistent with the wide range of mental health symptoms he claimed during the current evaluation. Likewise, behavioral observations were inconsistent with his report of symptoms. Consequently, it appears that Mr. ███ is exaggerating his claims of mental illness, rendering an accurate diagnosis, if any, impossible. Similarly, although Mr. ███ probably has some legitimate intellectual deficits as the result of his limited educational background, it appears that he exaggerated these impairments, as well.

Mr. ███ antisocial attitudes are reflected in a number of the comments he made during the course of the clinical interview. For example, although he claimed to be disabled and unable to work due to physical and mental impairments, he openly acknowledged working "under the table" by performing a

43

variety of odd jobs. When questioned about his limited work history, he indicated that one of the reasons he quit one of his jobs was because he did not like to be told what to do. This is not consistent with his claim of being too anxious around people to work. Other examples include Mr. ◼◼◼ description of efforts to evade Child Protective Service investigations by moving between states or cleaning his home in anticipation of home visits. He also attempted to externalize blame for his illegal behaviors by making excuses involving other illegal behaviors. For example, his first conviction for a sexual offense involved his sister as the victim. However, he claimed that she falsely accused him as the result of a dispute over money she owed from illegal drug transactions involving his ex-wife's selling their children's medications.

In discussing his legal history, Mr. ◼◼◼ repeatedly externalized blame and failed to take responsibility for his own choices and behavior. For example, he claimed that he only accepted a plea agreement regarding a previous sexual offense because his wife threatened to take away his children if he failed to do so. He also blamed his ex-wife for his prior probation violation because the setting event was his wife's claim of spousal rape, for which the charges were later dropped. This is despite the fact that it was his actions while incarcerated that were responsible for the probation violation and an additional charge. When confronted with this inconsistency, he then blamed the jail, claiming that the equipment he broke was defective, even though he acknowledges that he was clearly told not to touch it.

With respect to the current offense, Mr. ◼◼◼ efforts to externalize blame were again evident. Despite his guilty plea, he continued to deny committing acts of which he is accused. He placed blame on his ex-wife (the victim's mother), suggesting that she wanted to prevent Mr. ◼◼◼ from obtaining custody so that she would continue to receive the victim's Social Security payments. In addition, he made efforts to discredit the victim by alluding to potential mental illness on her part. At another point, however, he claimed that the victim had made the claims so that she would not have to live with Mr. ◼◼◼, due to the poor condition of their previous residence.

(Report of David Clayman, Ph.D. dated June 15, 2009, pp. 9-12)

44

B144

(19) The Court finds that the Petitioner was facing a potential maximum sentence of 182 to 430 years in prison, but pled guilty to charges which exposed him to 26 to 60 years in prison.

(20) The Court finds that both of Petitioner's trial counsel were and remain seasoned criminal defense attorneys with years of experience in representing criminal defendants in major felony prosecutions.

(21) The Court finds that during the plea colloquy, the following exchange occurred:

> Okay. The first form that I'm going to give you is two pages long. It's on Gibson, Lefler, and Associates stationary. I want you to look at that.
>
> Have you seen that letter before?
>
> MR. ████: Yes, Your Honor.
>
> THE COURT: Do you understand that's your contract, deal or plea agreement with the State?
>
> MR. ████: Yes, Your Honor.
>
> THE COURT: And you know whose got to do what, right?
>
> MR. ████: Yes, Your Honor.
>
> THE COURT: And did you sign that on the second page?
>
> MR. ████: Yes, Your Honor.

45

B145

THE COURT: Alright. There's nothing on the first page to sign. Alright, we'll make that a part of the court file.

Now I'm going to give you two things at once. The first one is a petition to enter plea of guilty front and back on a (sic) eight by eleven white piece of paper. The next is the Defendant's statement in support of guilty plea. It is the front and back of two pieces of paper and the front of a third so it's five pages long. It's on orange colored paper and has 73 questions. Have you seen those two forms before?

MR. ████: Yes, Your Honor.

THE COURT: Did you go over those forms with your attorneys?

MR. ████: Yes, Your Honor.

THE COURT: Mr. Lefler or Mr. Huffman?

MR. ████: Yes, Your Honor.

THE COURT: Did you have any questions about either of those forms?

MR. ████: No, Your Honor.

THE COURT: If you had any questions did they answer explaining them to your satisfaction?

MR. ████: Yes, Your Honor.

46

B146

THE COURT: So do you understand everything in those forms? All your rights and what you're giving up?

MR. ███████: Yes, Your Honor.

THE COURT: Now did you fill those out or did they fill it out for you?

MR. ███████: They filled it. I pretty much told them what to put.

THE COURT: So regardless of who wrote the answers down there they're your answers, is that right?

MR. ███████: Yes.

THE COURT: Now flip over that petition for me on the back. Is that your signature at the bottom of the petition on the back?

MR. ███████: Yes, Your Honor.

THE COURT: Alright. It looks to me like you signed four of the five places on the orange. Did you sign those four places?

MR. ███████: Yes, Your Honor.

THE COURT: Go ahead and sign the last if that's what you want to do.

And while he's doing that let's see, gentlemen, it looks like you completed the Attorney's statement in

support of guilty plea. Looks like Mr. Lefler filled it out but you both signed it, is that right?

MR. HUFFMAN: Yes, sir.

THE COURT: Alright. We'll get notarized.

The last is the actual plea of guilty. It's the front and back of an 8 by 11 white piece of paper. Have you seen that form before, sir?

MR. ████: Yes, Your Honor.

THE COURT: And did you go over that form with your attorneys, Mr. Huffman and Mr. Lefler?

MR. ████: Yes, Your Honor.

THE COURT: Did you have any questions about anything in that form?

MR. ████: No, Your Honor.

THE COURT: If you had any questions did they answer and explain them to your satisfaction?

MR. ████: Yes, Your Honor.

THE COURT: So you understand everything in that form? All your rights and what you're giving up.

MR. ████: Yes, Your honor.

THE COURT: Now, did you fill that out or did they fill it out for you?

MR. ████: I filled. . . he helped me fill it out.

48

THE COURT: They filled it out but they're your answers?

MR. ████ Yes, sir. Yes. Yes, Your Honor.

THE COURT: Now is this is what you want to do you need to sign right on the bottom there where the Bailiff is showing you and then flip it over and sign on the back and then you can have a seat.

(*See* Plea Transcript of April 21, 2009 at p. 45, L: 19 – p. 50, L: 2)

## FORMS BEING SIGNED

(22) The Court finds and concludes that Petitioner's trial counsel investigated this case.

(23) The Court finds and concludes that there was not a good faith basis to question the Petitioner's competency to stand trial or his criminal responsibility for his actions.

(24) The Court finds and concludes that the plea bargain negotiation was not inadequate, in that the Petitioner's sentence exposure was reduced by approximately 80%.

(25) The Court finds and concludes that Petitioner's trial counsel more than adequately represented him in this action.

(26) The Court finds and concludes that the Petitioner's claim that he received ineffective assistance of counsel is without merit.

B149

## 2. WAS THE PETITIONER'S GUILTY PLEA KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY MADE?

### a. Petitioner's Argument:

THE GUILTY PLEA WAS NOT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY MADE

Mr. ▓▓▓ has an extremely limited ability to read technical issues. This should be apparent to trial counsel through review of his barely readable letters, samples of which are present in the court file. Mr. ▓▓▓ has never been able to pass his GED and simply cannot and could not understand the complex legal process he was facing. Despite the issues regarding his mental state, explored later in this memorandum, and despite his functional illiteracy, trial counsel did not seek an evaluation of his competency or criminal responsibility. This failure led to counsel proceeding with advising Mr. ▓▓▓ using methods he couldn't understand. Thus, Mr. ▓▓▓ was simply unable to enter a knowing, intelligent and voluntary guilty plea.

The West Virginia Supreme Court of Appeals has held that the state and federal constitutions mandate that all plea agreements be knowingly, intelligently and voluntarily made. *E.g., State ex rel. Gill v. Irons*, 207 W.Va. 199, 202, 530 S.E.2d 460, 463 (2000). A plea cannot be knowingly, intelligently, and voluntarily made if the defendant is not fully informed and fully capable of accessing and processing the information needed to weigh the nature and consequences of the plea.

### b. The Respondent's Response:

PETITIONER'S GUILTY PLEA WAS KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY MADE

Petitioner fails to allege any valid constitutional violation. Petitioner voluntarily entered a guilty plea as reflected in the plea colloquy and the plea

50

papers petitioner signed. Not having a GED does not amount to failing to be able to knowingly, intelligently and voluntarily enters a guilty plea. Following an extensive plea colloquy, petitioner entered a knowing, intelligent, and voluntary plea to one count of first degree sexual abuse, one count of first degree sexual assault and one count of sexual abuse by a parent. *See* Tr. 4-21-2009 guilty plea hearing.

**c. Finding of Fact and Conclusions of Law:**

(1) The Court finds that the West Virginia Supreme Court of Appeals has held that:

> A direct appeal from a criminal conviction based on a guilty plea will lie where an issue is raised as to the voluntariness of the guilty plea or the legality of the sentence.
> *State v. Sims*, 162 W. Va. 212, 248 S.E.2d 834, W. Va. 1978). Syl. pt. 1

(2) The Court finds that the West Virginia Supreme Court of Appeals also held in *Sims* that:

> The controlling test as to the voluntariness of a guilty plea, when it is attached either on a direct appeal or in a habeas corpus proceeding on grounds that fall within those on which counsel might reasonably be expected to advise, is the competency of the advice given by counsel. Syl. pt. 2.

(3) The Court finds that the West Virginia Supreme Court of Appeals also held in *Sims* that:

> Before a guilty plea will be set aside based on the fact that the defendant was incompetently advised, it must be shown that (1) counsel did act incompetently; (2) the incompetency must relate to a matter which would have substantially affected the fact-finding process if the case had proceeded to trial; (3) the guilty plea must have been motivated by this error. Syl. pt. 3.

51

8151

THE COURT: Is your offer to enter this plea your own free and voluntary act, and are you entering this plea of your own free will? Mr. ████?

MR. ████: Yes, Your Honor.

(*See* Plea Transcript of April 21, 2009 at p. 40, L: 11 – 15)

(7) The Court finds that the Petitioner gave sworn testimony and made sworn statement that his plea was knowingly, voluntarily, and intelligently made.

(8) The Court finds that these statements were material, in that they induced the trial court to accept his guilty plea.

(9) The Court finds that the Petitioner has failed to produce any evidence sufficient to prove by a preponderance of the evidence that his plea was not knowingly, voluntarily, and intelligently made.

(10) The Court finds and concludes that the Petitioner's claim that his guilty plea was not knowingly, voluntarily, and intelligently made is without merit.

## 3. DID THE PETITIONER RECEIVE A DISPROPORTIONATE SENTENCE?

### a. The Petitioner's Argument

**PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED BY HIS DISPROPORTIONATE SENTENCE**

Mr. ████ received an effective sentence of 26-60 years. This is, in reality, a life sentence for Mr. ████. This sentence far exceeds many sentences for outright murder

The sentence in this case should shock the conscience of the court. If not, factors concerning Mr. ▓▓▓ family history, mental issues, and lack of prior conviction concerning children support a finding that the sentence is disproportionate along with the excessive nature of the sentence imposed.

**b. The Respondent's Response:**

PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE NOT VIOLATED BY HIS DISPROPORTAIONAL SENTENCE

To prevail under a proportionality argument, there must be gross disproportionality. *Graham v. Florida*, 130 S. Ct. 2011 (2010). When sentenced on July 6, 2009, petitioner was 43 years old. He is eligible for release at age 69. Certainly given his criminal history and the heinous crimes he committed against his own young daughter, his sentence is not disproportionate.

**c. Findings of Fact and Conclusions of Law:**

(1)     The Court finds that sentences which are within the statutory limits are not entitled to statutory review. *State v. Koon*, 190 W. Va. 632, 440 S.E.2d 442 (1993).

(2)     The Court finds that, while constitutional proportionality standards theoretically can apply to any criminal sentence, they are basically applicable to those sentences where there is either no fixed maximum set by or where there is a life recidivist statute. *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 276 S.E.2d 205 (1981). at syl. Pt. 4. The sentence in this action is not of either type.

(3) The Court finds and concludes that the trial court did not abuse its discretion in ordering these sentences. The trial court recited the factors it used in imposing these sentences on the record during the sentencing hearing held on July 6, 2009, specifically:

THE COURT: Well, I've looked through this thing and apparently this went on for an extended period of time. It's not the first time he's had a felony. He had one in Virginia that he actually spent time in the penitentiary on for a while and got out. He was on parole when they claim a lot of this took place.

So there was multiple counts here he was charged with. Looks like 16 counts and they let him plead guilty to 3. He's 43 years old. I mean, I don't know, this young girl out here, how she's going to deal with this. I hope she can.

So I'm going to sentence him to the penitentiary for 1 to 5 years on the Sexual Abuse in the First Degree, 15 to 35 years for the Sexual Abuse by a Parent, order they run consecutive and not concurrent.

It says here he really can't - - he's a high risk to reoffend.

And I'm going to give him credit for time served.

All things considered, I mean, I think given everything that happened to this young girl and given how many charges he had pending against him, he's got a parole offense here - - or rather was a parolee. They don't have parole, but a supervised release person from Virginia when all this was going on for basically the same kind of thing, it looks like.

B157

So you know, I've given some though to giving a split sentence in this and I just don't think that's appropriate at this time, given all the things we have here going on.

I understand his health situation but I also think about this young girl out here and what she's going through.

(*See* Sentencing Hearing Transcript of July 6, 2009 at p. 7, L: 7 – p. 8, L: 19).

(4)    The Court finds and concludes that the trial court's sentence was within statutory limits and was not based on impermissible factors. *State v. Goodnight,* 169 W. Va. 366, 287 S.E.2d 504 (W. Va. 1981) at syl. Pt. 4, *State v. Sugg,* 193 W. Va. 388, 456 S.E.2d 469 (1995).

(5)    The Court finds and concludes that the Petitioner's claim that his sentence is excessive and disproportionate to the character and degree of the offense pursuant to the West Virginia State Constitution Article III, Section 5 is without merit.

## 4. WERE THE PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS VIOLATED BY THE INDICTMENT?

**a. The Petitioner's Argument:**

An indictment is sufficient for due process purposes if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hamling v. United States,* U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974) (citations omitted). These due process rights not only apply to federal indictments, but court have found they also apply to state criminal charges. *Valentine v. Lonteh,* 395 F.3d 626, 631 (6th Cir. 2005) (citations omitted).

58

B158

Multiple, undifferentiated charges in an indictment violate a defendant's rights to notice and his right to be protected from double jeopardy. *Valentine v. Konteh,* 395 F.3d 626, 631 (6th Cir. 2005). A wide date range (such as a year) and a lack of differentiation among the criminal charges can prejudice a defendant's notice rights when there are a large number of identical charges. *Id.* at 632. When charges are based on a victim's estimates only, there is insufficient notice. *Id.* Double jeopardy is violated when there is insufficient specificity in the indictment or in the trial record to enable a defendant to plead convictions or acquittals as a bar to future prosecutions or undifferentiated counts create the possibility that the defendant would be subject to double jeopardy in his initial trial by being punished multiple times for what may have been the same offense. *Id.* at 634-635. Ten identical counts listing just the year 2001 are constitutionally suspect. *Dilworth v. Markle,* 2010 u.S. Dist. Lexis 12370 at *2, *7 (N.D.W.Va. 2010).

In this case there were exactly 10 charges of Sexual Assault First Degree, all from 2001, which were not otherwise differentiated (other than 2 listed sexual intrusion instead of sexual intercourse). (*See* Exhibit 2 at Counts 3-12). These appear to be based on a victim estimate. (*See* Ex. 10 at page 7, "[L.L.S.] estimated the abuse had occurred more than twenty (20) times"). The indictment clearly violates the constitutional principles described above.

### b. The State's Response:

Petitioner claims that because the indictment does not describe with specificity the locate or nature of the offense, his constitutional due process rights as to notice and double jeopardy were violated. In support of this claim, Petitioner relies exclusively on *Hamling v. United States,* 418 U.S. 87, 94 S. Ct. 2887, 41 L. Ed 590 (1974). *Valentine v.*

59

*Konteh,* 395 F.3d 626 (6ᵗʰ Cir. 2005), and *Dilworth v. Markle,* 2012 U.S. Dist. Lexis 12370 (N.D.W.Va. 2010). These cases are distinguishable and are not controlling here, requiring the conclusion that this indictment did not violate Petitioner's rights.

An indictment is sufficient for due process purposes if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 1997, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974) (citations omitted). These due process rights also apply to state criminal charges. *Valentine v. Konteh,* 395 F.3d 626, 631 (6ᵗʰ Cir. 2005).

*May v. Ballard,* 2012 U.S. Dist. LEXIS 135840 (N.D.W.Va., Aug. 9, 2012) distinguished *Valentine.*[7] May also claimed his indictment violated his constitutional due process rights because it failed to provide proper notice and it failed to protect May against double jeopardy rights as the counts failed to specify a specific date or distinguish between the alleged sexual conduct. Like petitioner████, May relied on *Hamoing, Valentine* and *Dilworth.*

In *Valentine,* the indictment contained twenty counts of child rape and twenty counts of felonious sexual penetration without distinction between any of the counts within each category. *Id.* at 629.[8] Significantly, in its charges, the prosecution did not attempt to lay out the factual bases (sic) for 40 separate incidents that took place; instead May's

---

[7] Wesley May was indicted in the Circuit Court of Berkeley County, West Virginia on the following charges: three counts of sexual abuse by a parent, guardian, custodian or person in a position of trust to a child in violation of West Virginia Code §§61-8D-5(a) (Counts One, Two, and Three); one count of distributing and exhibiting material depicting a minor engaged in sexually explicit conduct, in violation of West Virginia Code §§ 61-8A-2(a) (Count Five.) A jury convicted May of Counts One, Two, and Four. Petitioner May alleged his constitutional rights to notice of the charges levied at him and due process of law as secured by Fifth, and Sixth and Fourteenth Amendments to the Constitution of the United States were violated when the indictment returned by the Berkeley County Grand Jury failed to specify a specific date or distinguish between sexual conduct on any given date.

[8] Valentine was sentenced to 40 consecutive life sentences. *Id.* at 628.

60

stepdaughter described "typical" abusive behavior and testified that it occurred 20 or 15 times. *Id.* at 628. The Sixth Circuit found that the forty-count indictment did not satisfy the notice and double jeopardy requirements, and thus violated the petitioner's due process rights. *Id.* at 631. The court explained that the identical date range given in each count was not in conflict with the notice requirements. Rather, the issue with the indictment was that "absolutely no distinction was made" between any of the counts of child rape and twenty counts of felonious sexual penetration. *Id.* at 632. The *May* court further explained that:

> [t]he [*Valentine*] court found that the prosecution did not lay out a factual bases (sic) in its charges or in the evidence presented before the jury of forty separate incidents. *Id.* **The victim** was the only witness to testify regarding the incidents and she **testified** in terms of estimates of how many times the various incidents occurred, **without distinguishing one incident from another.** *Id.* at629. As the court noted, **"[t]he due process problems in the indictment might have been cured had the trial court insisted that the prosecution delineate the factual bases (sic) for the forty separate incidents either before or during the trial."** *Id.* at 634 (emphasis added).

In *May*, the prosecution delineated the factual bases (sic) for the separate counts of the indictment during trial, and the victim testified in detail to at least four separate incidents occurring within the time frame provided, leading the court to conclude that, petitioner May's due process rights were not violated because he was provided adequate notice of the charges against him and he was protected from double jeopardy.

In the instant case, the State delineated the factual bases (sic) for the separate counts of the indictment against ███ in pre-trial discovery which included the child-victim's statement, the child-victim's play therapy counseling notes, and petitioner's wife's statement. Petitioner was charged with one count for each type of sexual offense at the two different Mercer County residences in which his daughter stated he had abused her. One residence was in Breeze Hill Mobile Home Park. The other residence was in their apartment on Sandlick Road. Petitioner's daughter stated that petitioner vaginally penetrated her vagina and anus with his penis, that he vaginally penetrated her vagina with his finger; that he made her perform fellatio on him that he performed cunnilingus on her, and that he made her masturbate him.

Contained in the indictment were the following counts: two counts of first degree sexual abuse (1-5 x 2) arising from when petitioner made L.L.S. masturbate him at two different residences in Mercer County during 2001; ten counts of first degree sexual assault (15-35 x 10) arising from when petitioner had anal and vaginal intercourse by inserting his penis into her vagina, when he performed cunnilingus on her and made her perform fellatio on him and when he digitally penetrated her vagina at two different residences in Mercer County during 2001; two counts of sexual abuse by a parent (10-20 x 2); and two counts of incest (5-15 x 2).

Petitioner was provided specific information to differentiate the counts of sexual abuse and assault against his daughter. Accordingly, petitioner's claim of dur process and double jeopardy violations fail.

B162

**c. The Petitioner's Reply:**

Counsel for the State attempts to justify the unconstitutional indictment by relying on the delineation of the factual basis for the separate counts that were provided in discovery, but never made a part of the record of the case. (*See* State's Memorandum at p. 11). Obviously, the indictment is insufficient on its face as it does not "enable [] him to plead an acquittal or conviction in bar of future prosecutions for the same offense" *Hamling v. United States*, 418 U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974) (citation omitted). To fix the defective indictment there must be sufficient specificity in the trial record. *Valentine v. Konteh*, 395 F.3d 626, 634-5 (6th Cir. 2005). Here, the trial record shows that the only information proffered on the record lacked the required specificity as it was vague, lacked specifics, and did not differentiate the conduct. (*See* State's Memorandum at p. 2).

**d. Findings of Fact and Conclusions of Law:**

(1) The Court finds that the West Virginia Supreme Court of Appeals has held that:

> " 'An indictment for a statutory offense is sufficient if, in charging the offense, it substantially follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based.' Syl. Pt. 3, *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983)."
> Syl. Pt. 1, *State v. Mullins*, 181 W.Va. 415, 383 S.E.2d 47 (1989). Sy. Pt. 3, *Ballard v. Dilworth*, 230 W.Va. 449, 739 S.E. 2d 643.

(2) The Court finds that the West Virginia Supreme Court of Appeals has held that:

> " 'An indictment is sufficient under *Article III, §14 of the West Virginia Constitution* and *W. Va. R. Crim. P. 7(c) (1)*

63

if it (1) states the elements of the offense charged; (2) puts a defendant on fair notice of the charge against which he or she must defend; and (3) enables a defendant to assert an acquittal or conviction in order to prevent being placed twice in jeopardy.' Syl. Pt. 6, *State v. Wallace*, 205 W.Va. 155, 517 S.E.2d 20 (1999)." Syl. Pt. 5, *State v. Haines*, 221 W.Va. 235, 654 S.E.2d 359 (2007). Syl. Pt. 4, *Ballard v. Dilworth*, 230 W.Va. 449, 739 S.E.2d 643.

(3) The Court finds that West Virginia Code Section 62-2-10 states that:

No indictment or other accusation shall be quashed or deemed invalid . . . for omitting to state, or stating imperfectly, the time at which the offense was committed, when time is not of the essence of the offense.

(4) The Court finds that the West Virginia Supreme Court of Appeals has repeatedly stated that the exact dates of child sexual assaults are not required in an indictment alleging such conduct. *See State v. David D.W.*, 214 W.Va. 167, 173, 588 S.E.2d 156, 162 (W.Va. 2003) and *State v. Miller*, 195 W.Va. 656, 664, 466 S.E.2d 507, 515 (1995).

(5) The Court finds that the Petitioner did not file a challenge to the sufficiency of the indictment or a motion for a bill of particulars in the underlying action. (*See* Docket Sheet of 08-F-120, attached hereto as Exhibit A).

(6) The Court finds that Petitioner's trial counsel filed a "Motion for Discovery and Inspection" on February 5, 2009.

(7) The Court finds that it ordered the State to provide all information concerning 404(b) evidence to the Petitioner's trial counsel not later than April 10, 2009, in orders entered on March 31, 2009, and April 7, 2009.

64

B164

(8) The Court finds that it conducted a pretrial conference on April 13, 2009, at which each party acknowledged the receipt of the other's discovery, and during which no issues were raised about discovery other than the question of 404(b) evidence.

(9) The Court finds that the indictment in this action substantially followed the language of the statute, fully informed the Petitioner of the accused of the particular offenses with which he was charged, and enabled him to assert an acquittal or conclusion in order to prevent being placed twice in jeopardy.

(10) The Court finds and concludes that the Petitioner's assertion that his federal and state constitutional rights were violated by the indictment is without merit.

## 5. ALL ADDITIONAL GROUNDS RAISED BY PETITIONER IN HIS *LOSH CHECKLIST*

**a. The Petitioner's Argument:**

Petitioner also hereby asserts all grounds raised her (sic) *Losh* checklist filed contemporaneously herewith:

Those issues not previously addressed herein include:

- That the evidence was insufficient to support a guilty verdict as, for the reasons described herein, Mr. ███████ is actually innocent;

- That his PSI was incorrect; and

- That prejudicial pretrial publicity existed in the case

**b. Respondent's Response:**

65

BI65

The State did not reply to these assertions

c. **Findings of Fact and Conclusions of Law:**

(1) The Court **FINDS** that in determining whether or not there was sufficient evidence to sustain a criminal conviction, the West Virginia Supreme Court of Appeals has stated that:

> (w)hen a criminal defendant undertakes a sufficiency challenge, all of the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule required the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecutor's favor; moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt. *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (W.Va. 1996), syl. pt. 2.

(2) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

> (t)he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the Defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Guthrie*, Syl. Pt. 1, 194 W.Va. 756, 461 S.E.2d 163 (1995).

(3) The Court finds that the *Guthrie* court also stated that:

B166

a criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not for an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find a guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *Guthrie, infra.*

(4) The Court **FINDS** that the term "actual innocence" first entered West Virginia jurisprudence when it was referred to in Justice Cleckley's concerning opinion in *State v. Phalen*, 192 W.Va. 267, 452 S.E.2d 70 (1994).

(5) The Court **FINDS** that Justice Cleckley used the term in his concurring opinion while discussing his disagreement with the West Virginia Supreme Court's standard of review for insufficiency of evidence claims, and that as Justice Cleckley pointed out while actual innocence and rational juror were used interchangeably *in Sawyer v. Whitley*, 505 U. S. 333, 112 S. Ct. 2514, 120 L. Ed.2d 269 (1992), the term "actual innocence" is a much narrower concept than that envisioned by the U. S. Supreme Court in *Jackson v. Virginia*, 443 U. S. 307, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979), that "no rational trier of fact could have found proof of guilty beyond a reasonable doubt."

B167

(6)  The Court finds that the concept of "actual innocence" was discussed in State ex. rel *Smith v. McBride*, 224 W.Va. 196, 681 S.E.2d 81 (W. Va. 2009).  The Court stated in footnote 44, that:

> "the actual innocence doctrine was developed for the purpose of permitting federal courts to review claims by a defendant that were procedurally barred:
>
>> an actual innocence claim is a gateway through which a habeas petitioner (may) have his otherwise barred constitutional claim considered on the merits.  To succeed, the petitioner must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  Further, 'actual innocence' required the petitioner to show factual innocence, not mere legal insufficiency."

(7)  The Court finds that the record demonstrates that there was a sufficient factual basis for the trial court to accept the Petitioner's plea of guilty.

(8)  The Court finds that the Petitioner answered the following questions on the "Defendant's Statement In Support Of Guilty Plea":

43.  Do you believe yourself to be guilty?          **Yes**

44.  Describe briefly your participation in the crime.

**I touched my daughter in an inappropriate ways.**

45.  Have you discussed the matters and things which cause you to believe that you are guilty with you (sic) attorney, **Mr. Lefler and Mr. Huffman?**          **Yes**

68

THE COURT: Well tell me what happened.

MR. ████████: I didn't threaten nobody with a knife that's for sure.

THE COURT: You didn't what?

MR. ████████: I didn't threaten nobody with a knife.

THE COURT: Okay. But did you have sex with her?

MR. ████████: I came in one night out of my mind and I was laying on the couch and Lora came to me and she was laying on my arm and she touched me and I touched her and then I realized what I was doing and put her back to bed and that was it but I pleaded guilty to these charges in my best interest.

THE COURT: So this is a best interest?

MR. ████████: Yes, sir.

THE COURT: Mr. Lefler? Mr. Huffman, what's the story here?

I mean he's facing a long time in jail for your know, for —

MR. LEFLER: Yes, sir.

Your Honor, Mr. ████, has indicated a desire to enter a guilty plea and we have talked about the allocution and the State's . . . the fact that the State would make representations as to the uh as to the evidence and Mr. ████ needed to either offer an agreement to that or indicated that he wished to take the plea in . . in terms of his best interest. He recognizes I think clearly the . . .

71

the gravity of the State's evidence and . . .and during our discussions that has been matter of significant concern.

THE COURT: Well, let me explain something else to your, Mr. ████ I mean, you do what you feel like you need to do, alright. I can't let somebody plea guilty that's not guilty. I can't do that. Now, you know the only . . .if you tell me you're not guilty the only way I can do that is if you tell me that's it's in your best interest. And I'm going to explain that to you but there's another thing that you need to understand about a sex offender case which is this.

Once you get convicted of this, I have to order an evaluation. A sexual offender evaluation, okay. And the part of that evaluation, the main thrust of it is to see whether or not you are treatable in the community or whether you're not. Because I cannot . . . you are not eligible for probation if you're not treatable in the community,

Do you understand that?

MR. ████: Yes, Your Honor.

THE COURT: And I can tell you this from over eight years of doing this, I don't know of a person that treats sex offenders who will ever come in here and say they can treat somebody who doesn't admit they've done anything.

Do you understand that?

72

ß172

MR. ███████: Yes, Your Honor.

THE COURT: So if you want to . . .want to, and you don't have to admit it. And I'm not telling you that to force you to admit it. But I'm just saying that takes one of the options away.

Do you understand that?

MR. ███████: Yes, Your Honor.

THE COURT: Alright.

Now, I'm going to go this best interest stuff.

Is that agreeable with the State?

MR. SITLER: The State is agreeable with best interest plea for Mr. Spears, if that's what he wants to do.

THE COURT: Let me explain how that works to you, sir.

Are you offering to plea guilty to these three charges; sexual abuse in the first degree, sexual intercourse, or rather sexual assault in the first degree, and sexual abuse by a parent because you are making an effort to avoid the possibility that a much stiffer or much higher penalty or sentence might be imposed on you if you went to trial and were found guilty. In other words are you doing this to avoid even worse?

MR. ███████: Pretty much. Yes, Your Honor.

THE COURT: And has . . .have your attorneys explained to you the various or different alternatives, options or choices

73

B173

which are available to you to deal with these charges? In other words have they told you what your choices are?

MR. ⬛⬛⬛: Yes, Your Honor.

THE COURT: I'm going to do the same thing here with you. Okay?

Your choices are this – Because the State's not going to dismiss this, or are you?

MR. SITLER: No, Your Honor.

THE COURT: It's going to trial if you don't plea and that's fine. You have a right to a trial as I was explaining and they've got the burden of proof. But if you have a trial we'll all put twelve jurors over there plus one alternate and they'll decide whether they believe the State or not. Okay. And if they find you not guilty of these things then you're free to go. But if they find you guilty of these things they you face far –

MR. ⬛⬛⬛: Four hundred and ninety some years.

THE COURT: Four hundred years. Is that what it adds up to, gentlemen?

MR. LEFLER: Yes, sir.

THE COURT: You've all done that up to – alright. So you face 400 years in jail and you know, you're what? Forty-three, right?

B174

MR. ██████: Yeah. And I'll be lucky to make it another ten.

THE COURT: Huh?

MR. ██████: I said I'd be lucky to make it another ten, Your Honor.

THE COURT: Well, what is it that Methusela lived, 900, isn't that what the Bible says. I mean, Noah lived to be 120 years so I guess the point in me telling you – Not Noah. Moses lived to be 120 years so the point of me telling you all that is that we don't live that long. We don't live 400 years. You know.

MR. ██████ No.

THE COURT: So, I mean, this is a high risk strategy. I mean, you can take your chances with the jury. And you've got excellent lawyers who frankly have had good success, as good success as people can have in these cases. And . . .and who understand them from representing people like you, from having habeas corpus hearings, representing people who have been convicted and things like this. I mean, they . . .they understand how the . . .the ground is here.

But it's your choice. So is that . . .do you understand that? Is that what you're doing?

MR. ██████: Yes, Your Honor.

THE COURT: Alright.

75

β11ς

(*See* Plea Hearing Transcript of April 21, 2009 at p. 50, L: 5 – p. 58, L: 8).

(10) The Court finds that the same record demonstrates that the "actual innocence" concept does not apply in this case.

(11) The Court finds the Petitioner has failed to prove by a preponderance of the evidence that there was not a factual basis for his guilty plea, or that he was actually innocent.

(12) The Court finds and concludes that all of the other matters raised in his *Losh* checklist, to include his claim that he is actually innocent, are without merit.

## IV.  RULING

Wherefore, for the reasons set forth in the foregoing opinion order, the Court hereby orders and adjudges as follows:

1.  That the Petition for Writ of Habeas Corpus *ad Subjiciendum* is hereby denied and this action is removed from the docket of this Court.

2.  The Court appoints Paul R. Cassell, Esq. to represent the Petitioner should he choose to appeal this ruling.

3.  This is the final order.  The Circuit Clerk is directed to distribute a certified copy of this Order to Paul R. Cassell, Esq., at his address of 340 West Monroe Street, Wytheville, Virginia, 24382; to Scott A. Ash, Esq., Prosecuting Attorney of Mercer County, West Virginia, at his address of 120 Scott Street, Suite 200, Princeton, West Virginia, 24740;

76

8176

and to the Petitioner, Gerald ███, c/o Mt. Olive Correctional Complex, #1 Mountain

Side Way, Mt. Olive, West Virginia, 25185.

Entered this the 24th day of January, 2014.

_Derek C. Swope_

**DEREK C. SWOPE, JUDGE**

THE FOREGOING IS A TRUE COPY OF A DOCUMENT
ENTERED IN THIS OFFICE ON THE _24th_ DAY
OF _January_ 20 _14_
DATED THIS _24th_ DAY OF _January_
20 _14_

JULIE BALL, CLERK OF THE
CIRCUIT COURT OF MERCER COUNTY WV

BY _Marid S. Fox_
HER DEPUTY

B177